**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
PENSION BENEFIT GUARANTY                    :
CORPORATION,                                :       13 Civ. 621 (RJS)
                                            :
                  Plaintiff,                :       ECF Case
                                            :
      - against -                           :
                                            :
THE RENCO GROUP, INC., et al.,              :
                                            :
                                            :
                  Defendants.               :
                                            :
                                            :
------------------------------------------------------------ x
```

**THE PENSION BENEFIT GUARANTY CORPORATION'S REPLY**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................................1

I.  PBGC is Entitled to Summary Judgment Under 29 U.S.C. § 1369..........................2

    A.  29 U.S.C. § 1369 Applies If "a Principal Purpose" of
        Entering into a Transaction is to Evade Pension Liability.................................2

    B.  Renco Entered into the Transaction with a Principal
        Purpose of Evading Liability for the Pension Plans ..........................................5

        1.  Renco explicitly structured the Transaction to ensure that
            RG Steel was removed from Defendants' controlled group..................6

        2.  Renco made misrepresentations to PBGC about the status of
            the Transaction.................................................................................11

II. Renco's Misrepresentations and Omissions Caused PBGC to Suspend
     Its Termination of the Plans, to PBGC's Detriment ..............................................12

CONCLUSION..............................................................................................................15

# **TABLE OF AUTHORITIES**

**CASES**

*Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc., v. Centra,*
    983 F.2d 495 (3d Cir. 1992) ...................................................................................9

*Century Pacific Inc. v. Hilton Hotels Corp.,*
    528 F. Supp. 2d 206 (S.D.N.Y. 2007)..................................................14, 15

*LaChance v. Erickson,* 522 U.S. 262 (1998) ........................................................13, 14

*Lazard Freres & Co. v. Protective Life Insurance Company,*
    108 F.3d 1531 (2d Cir. 1997)......................................................................15

*Lopresti v. Pace Press, Inc.,* 868 F. Supp. 2d 188 (S.D.N.Y. 2012) .......................3, 6

*Lyman v. CSX Transportation, Inc.,* 364 F. App'x 699 (2d Cir. 2010) ....................12

*PBGC v. White Consolidated Industries, Inc.,*
    215 F.3d 407 (3d Cir. 2000)..............................................................2, 6, 7

*Santa Fe Pacific Corp. v. Central States, Southeast & Southwest Areas Pension Fund,*
    22 F.3d 725 (7th Cir. 1994) ................................................................3, 6, 8

*Sherwin-Williams Co. v. N.Y. State Teamsters Conference*
    *Pension & Retirement Fund*, 158 F.3d 387 (6th Cir. 1998) ........................3

*Solar v. PBGC*, 504 F. Supp. 1116 (S.D.N.Y.),
    *aff'd*, 666 F.2d 28 (2d Cir. 1981)..............................................................4, 5

*SUPERVALU, Inc., v. Board of Trustees of the Southwestern Pennsylvania and Western*
    *Maryland Area Teamsters & Employers Pension Fund,*
    500 F.3d 334 (3d Cir. 2007)......................................................................3, 4

*Teamsters Joint Council No. 83 Va. Pension Fund v. Empire Beef Co.*,
    3:08CV340, 2011, WL 201492 (E.D. Va. Jan 20, 2011) ............................3

*United States v. Gonzales,* 520 U.S. 1 (1997)............................................................4

**STATUTES**

29 U.S.C. § 1301(a)(14)(A) & (B)..............................................................................8

29 U.S.C. § 1362(a), (b)..............................................................................................5

29 U.S.C. § 1369................................................................................................ passim

29 U.S.C. § 1369(a) ....................................................................................................2

29 U.S.C. § 1392(c) ....................................................................................................4

Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. No. 93-406, 88 Stat. 829, § 4063 (codified as 29 U.S.C. § 1363) .................................................5

**REGULATIONS**

26 C.F.R. § 1.414(c)-1 ................................................................................. 8

26 C.F.R. § 1.414(c)-2 ..........................................................................6, 8, 9

26 C.F.R. § 1.414(c)-4 ..................................................................................8

29 C.F.R. § 4001.3 ........................................................................................8

**OTHER AUTHORITIES**

Congressional Record 17227 (June 25, 1985) ............................................4

H.R. Rep. No. 99-300 (1985), *reprinted in* 1986 U.S.C.C.A.N. 756 .........................2

H.R. REP. NO. 99-241, pt. 2 (1985), *reprinted in* 1986 U.S.C.C.A.N. 685 ............4, 5

**PRELIMINARY STATEMENT**

Defendants mischaracterize PBGC's arguments and the record, asserting that PBGC has abandoned its original legal theories because they have been "discredited" by discovery. In fact, PBGC seeks summary judgment on its original theories, which have been confirmed and strengthened through discovery.

The undisputed facts in the record establish that Defendants are liable to PBGC under 29 U.S.C. § 1369 as a matter of law. The record establishes that Renco entered into the transaction with Cerberus on January 17, 2012 (the "Transaction") with a principal purpose of evading RG Steel's pension liability. By doing so, Defendants evaded $155 million of liability that would be payable to PBGC and the Steelworkers multiemployer plan if RG Steel failed. Renco demonstrated its purpose of pension evasion by explicitly demanding that the Transaction be structured to remove RG Steel from Defendants' controlled group, despite protests from Cerberus. And when PBGC threatened this evasion by stating that it would terminate the plans before any transaction closed, Renco achieved its purpose by misrepresenting the Transaction's status to PBGC.

The undisputed facts also show that PBGC has established the elements for its state-law fraud claims through clear and convincing evidence. Renco materially misrepresented the status of the Transaction and its amenability to entering a standstill agreement during a call with PBGC on January 13, 2012. Defendants cannot dispute the myriad steps Renco and Cerberus took toward completing the Transaction in the days preceding the January 13 call – activities which continued during the call. Defendants try to minimize these facts by claiming that Renco and Cerberus reached an "impasse" after the call. But Defendants cannot dispute that within minutes of the supposed impasse, Renco and Cerberus arranged to meet the following day to resolve the

1

open issues, or that Renco's counsel continued working non-stop until the deal closed.  Most importantly, Renco never told PBGC the true state of affairs prior to the closing.

PBGC relied on Renco's misrepresentations during the January 13 call to its detriment.  Rather than completing plan termination by signing the necessary notices, PBGC sent Renco the requested standstill agreement.  PBGC's reliance resulted in damage.  Renco closed on the Transaction the very next business day, breaking RG Steel from Defendants' controlled-group.

## I. PBGC IS ENTITLED TO SUMMARY JUDGMENT UNDER 29 U.S.C. § 1369.

### A. 29 U.S.C. § 1369 Applies If "a Principal Purpose" of Entering into a Transaction Is to Evade Pension Liability.

In their opposition, Defendants continue to declare that section 1369 "is intended to reinstate liability only for transactions having no purpose other than to avoid [pension] liability."[1]  They claim the Transaction had a "legitimate economic purpose" of financing RG Steel, and conclude that liability is inappropriate.  Defendants ignore the law and the record.

Before enacting section 1369, Congress recognized the need for a "prophylactic rule to protect [PBGC's] insurance program from companies that transfer large amounts of unfunded benefits to a weaker company or that otherwise attempt to evade liability for their pension promises."[2]  Section 1369 imposes reach-back liability "[i]f a principal purpose of any person in entering into any transaction is to evade [pension] liability."[3]  Applying this plain language, the key "inquiry is whether [Renco] had 'a principal purpose' of evading its pension liabilities."[4]

---

[1]  Defs. Mem. of Law in Opp'n to Pls. Mot. for Summ. J. (hereinafter "Defs. Opp'n Brief") at 21.

[2]  H.R. REP. NO. 99-300, at 279 (1985) (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 756, 930.

[3]  29 U.S.C. § 1369(a).

[4]  *PBGC v. White Consol. Indus., Inc.*, 215 F.3d 407, 414 (3d Cir. 2000) ("*WCI II*").

Defendants are not the first to invite a court to rewrite Congress's language and change "a principal purpose" to "the principal purpose." In its prior briefs, PBGC cited numerous decisions that rejected such an invitation.[5] The courts addressing this issue have consistently recognized that a transaction can have more than one principal purpose, and that imposing liability under Title IV is appropriate so long as one principal purpose is pension evasion.[6] Indeed, in *Santa Fe Pacific Corp.*, the Seventh Circuit explained that "[t]he issue is not whether Santa Fe had compelling reasons independent of withdrawal liability to divest itself of SFTT; that is a given. . . . [The issue] is whether the avoidance of withdrawal liability by the seller . . . is one of the principal purposes of the transaction."[7]

Defendants also ask the Court to reject those previous holdings and limit section 1369 liability to only sham transactions with no economic purpose except pension evasion.[8] Defendants claim their interpretation is supported by legislative history. Again, similar

---

[5] PBGC's Mem. of Law in Support of Summ. J. (hereinafter "PBGC SJ Brief") at 19; PBGC's Mem. of Law in Opp'n to Defs. Mot. for Summ. J. (hereinafter "PBGC Opp'n Brief") at 13-14.

[6] *See Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994) ("[W]e would be doing violence to the language and the purpose of the statute if we read "a principal" as "the principal."); *see also SUPERVALU, Inc. v. Bd. of Trs. of the Sw. Pa. & W. Md. Area Teamsters & Emp'rs Pension Fund*, 500 F.3d 334, 342 (3d Cir. 2007) (same); *Sherwin-Williams Co. v. N.Y. State Teamsters Conference Pension & Ret. Fund*, 158 F.3d 387, 395 (6th Cir. 1998) (same); *Lopresti v. Pace Press, Inc.*, 868 F. Supp. 2d 188, 201 (S.D.N.Y. 2012) (same). Reading "a principal purpose" to describe one of multiple purposes is not unique to ERISA. *See* PBGC Opp'n Brief at 15 n.25 (citing *In re Kellogg Brown & Root, Inc.*, 14-5055, 2014 WL 2895939, *5 (D.C. Cir. June 27, 2014) (discussing "a primary purpose")).

[7] *Santa Fe*, 22 F.3d at 729-30 ("The issue is the *form* the divestiture took–a sale of stock rather than of assets"); *see Sherwin-Williams*, 158 F.3d at 395 (referencing the arbitrator's decision that defendant's "'number one, first reason' for deciding to sell Lyons may have been to eliminate the negative cash flow, but that a principal purpose [for the structure] was to evade or avoid withdrawal liability"). *Accord Teamsters Joint Council No. 83 Va. Pension Fund v. Empire Beef Co.*, 3:08CV340, 2011 WL 201492, at *4-5 (E.D. Va. Jan. 20, 2011) (contrasting mere awareness of liability with "facts demonstrate[ing] a specific intent to avoid . . . liability").

[8] Defs. Opp'n Brief at 21-22.

arguments have been summarily rejected by courts asked to interpret the plain language of Title IV. As the Third Circuit held in *SUPERVALU*, "[w]e will not allow an examination of the legislative history to create an ambiguity where none exists in the statute."[9]

But even if it were appropriate to resort to the legislative history of section 1369, Defendants' position is unavailing. Defendants oddly assert that Congress intended a narrow construction for section 1369 because it did not pass a different bill that would have prescribed "detailed, *per se* rules imposing contingent liability on certain specified corporate transactions."[10] But Congress's decision to pass a broadly worded statute rather than prescribe limited circumstances for imposing reach-back liability speaks volumes. In fact, the legislative history broadly references "a general grant of authority to the PBGC to ignore certain corporate transactions if a principal purpose of the transaction is to evade [plan termination] liability."[11] Defendants also attempt to manufacture a narrow reading of section 1369 by asserting that Congress modeled it after *Solar v. PBGC*, which Defendants characterize as holding "that there was no intention to 'evade or avoid' pension liability . . . because the company had a *bona fide* legitimate business reason for" its actions.[12] Defendants overlook a critical aspect of *Solar*. In concluding that the employer was not liable, the court relied on *PBGC's finding* that defendant

---

[9] *SUPERVALU,* 500 F.3d at 343-344 (addressing the same language in 29 U.S.C. § 1392(c)); *see also United States v. Gonzales*, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history." (citation omitted)).

[10] Defs. Opp'n Brief at 26 (citing Single-Employer Pension Plan Termination Insurance Improvement Act of 1983, Cong. Rec. 11303, 11305 (May 5, 1983)).

[11] Congressional Record 17227 (June 25, 1985); *see also* H.R. REP. NO. 99-241, pt. 2, at 55-56 (1985), *reprinted in* 1986 U.S.C.C.A.N. 685, 713-14 ("[A] detailed provision might result in unintended imposition of liability in some cases and fail to impose intended liability in others.").

[12] Defs. Opp'n Brief at 27 (citing 504 F. Supp. 2d 1116, 1118-20 (S.D.N.Y.), *aff'd*, 666 F.2d 28 (2d Cir. 1981)).

4

opened its repair facility "'for ordinary business reasons and that the avoidance of the consequences of Section 4063 of ERISA **was not a factor** in [its] decision.'"[13]  Congress cited *Solar* approvingly for the proposition that where a transaction is intended to evade pension liability, it should be disregarded.[14]  Here, the record confirms that Renco intended to evade liability for the Pension Plans.

> **B. Renco Entered into the Transaction with a Principal Purpose of Evading Liability for the Pension Plans.**

As detailed in PBGC's prior briefs, there is ample undisputed evidence that Renco entered the Transaction with a principal purpose of evading RG Steel's pension liabilities.[15]  Facing this evidence, Defendants resort to mischaracterizing PBGC's arguments, which they dismiss as "wildly implausible."[16]  To the contrary, PBGC's position is fully supported.

At the time of the Transaction, RG Steel was failing.  PBGC SOF ¶¶ 14-15, 22; Defs. SOF ¶ 10-12, 22.[17]  Renco knew that the Pension Plans were underfunded by about $70 million, and that Defendants would be jointly and severally liable for that underfunding if the Pension Plans terminated.  PBGC SOF ¶ 31; Menke Decl. Ex. 12.[18]  Renco also knew of the potential withdrawal liability due to RG Steel's participation in the multiemployer Steelworkers Pension

---

[13]  *Solar*, 504 F. Supp. at 1122 (emphasis added).  PBGC later sought to change its interpretation of "withdrawal," but that change was not relevant to PBGC's findings about intent.  *See id*.

[14]  H.R. REP. NO. 99-241, pt. 2, at 55, 1986 U.S.C.C.A.N. at 713.

[15]  *See generally* PBGC SJ Brief at 21-28; PBGC Opp'n Brief at 11-24.

[16]  Defs. Opp'n Brief at 22.

[17]  "PBGC SOF" refers to PBGC's Local Rule 56.1 Statement of Material Facts on Mot. for Summ. J. "Defs. SOF" refers to Defs.' Rule 56.1 Statement of Material Facts Not in Dispute.

[18]  *See* 29 U.S.C. § 1362(a), (b).  "Menke Decl." refers to the Declaration of John A. Menke, dated June 19, 2014, and submitted in support of PBGC's Motion for Summary Judgment.

5

Trust.[19]  Defendants now suggest that Renco's evasion of RG Steel's pension liabilities is "economically implausible" because Renco "undoubtedly" would have assumed the Pension Plans to avoid termination.[20]  The record contains no support for this assertion—Renco never suggested it would assume the Pension Plans.  Rather, it is entirely plausible that Renco wanted to evade the more than $150 million in pension liability that it would face if RG Steel failed, and Renco knew that Defendants could evade this liability if RG Steel's controlled group was broken.  *See* PBGC SOF ¶ 19; First Amended Compl. Ex. B.

   1. ***Renco explicitly structured the Transaction to ensure that RG Steel was removed from Defendants' controlled group.***

Defendants' actions in structuring a transaction can establish that pension evasion was a principal purpose.[21]  "[O]ne purpose may motivate an employer's decision to conduct a transaction, while another purpose may motivate the decision about how to structure this transaction."[22]  In the Transaction, Renco transferred 24.5% of its RG Steel membership units (direct equity) to Cerberus, along with warrants to purchase an additional 24.5% of that equity.  By transferring more than 20% of its RG Steel equity to Cerberus, Renco removed RG Steel from Defendants' controlled group.[23]  Defendants argue that section 1369 cannot apply "merely

---

[19]  *See* Menke Decl. Ex. 40.  Although Defendants dispute Renco's awareness of the potential for withdrawal liability, that awareness is confirmed by Renco's own document.  *Compare* Defs. Opp'n Brief at 10-11 (citing deposition testimony of Ira Rennert), *with* Menke Decl. Ex. 40.

[20]  Defs. Opp'n at 9-10.

[21]  *WCI II*, 215 F.3d at 414 (pension evasion "played a major role in shaping the . . . terms").

[22]  *Lopresti v. Pace Press, Inc.*, 868 F. Supp. 2d 188, 201 (S.D.N.Y. 2012); *see also Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 728-29 (7th Cir. 1994).

[23]  *See* 26 C.F.R. § 1.414(c)-2(b)(2) (defining controlling interest as, *inter alia*, 80% ownership).

because the known effect of one of the transaction's terms was loss of controlled group status."[24]

But removing RG Steel from Defendants' controlled group was not a mere by-product of the

Transaction; to the contrary, Renco actively and intentionally structured the Transaction to

ensure that RG Steel left the controlled group.

From the very beginning of its involvement in the RG Steel financing, Cerberus did not want to receive any direct equity in RG Steel. *See, e.g.,* PBGC SOF ¶¶ 43, 46; Menke Decl. Exs. 5, 20. As Cerberus executive Daniel Wolf emphasized, Cerberus always discussed receiving warrants that could be exercised later to purchase direct equity, if that equity ever became valuable. *See* Menke Decl. Ex. 23 at RENGRP0013513. This was not unique to the RG Steel Transaction; Cerberus routinely received warrants in its financing transactions, not actual equity. *See id.*; Albaugh Decl. Ex. 5 at RENCO0009848.[25] Therefore, in the term sheet Cerberus prepared reflecting its agreement in principal with Renco, Cerberus would receive two tranches of warrants exercisable for a total of 49% of RG Steel's equity. Menke Decl. Ex. 20.

When Renco's lead counsel, Michael Ryan, received the draft documents from Cerberus's counsel on January 11, 2012, he immediately contacted Cerberus' counsel and demanded that Cerberus receive one tranche of warrants in the form of direct equity. PBGC SOF ¶¶ 46-47. The Court need not speculate about why Mr. Ryan made this request – he testified that he wanted to ensure that RG Steel was removed from Defendants' controlled group.[26] Mr. Ryan also stated his belief that the warrants were more appropriately labeled as

---

[24] Defs. Opp'n at 26.

[25] "Albaugh Decl." refers to the Declaration of Colin B. Albaugh, dated July 18, 2014, and submitted in opposition to Defendants' Motion for Summary Judgment.

[26] PBGC SOF ¶ 47; Menke Decl. Ex. 17, Ryan Dep. at 100-07, 145-47; *see also* Menke Decl. Exs. 41, 43; *WCI II*, 215 F.3d at 415-18 (describing the steps taken to evade pension liabilities).

7

membership units because the contractual agreement between Renco and Cerberus allowed them to participate in distributions and granted consent rights. But that belief (which applied only to the 24.5% of direct equity needed to break the controlled group) does not negate Mr. Ryan's express intention of breaking RG Steel's controlled group.[27] And despite Defendants' efforts to downplay its significance, Renco's counsel repeatedly raised this issue with Cerberus, even though Cerberus initially rejected Mr. Ryan's demands, until Cerberus finally accepted direct equity. *See* Menke Decl. Exs. 23, 35; Menke Decl. Ex. 18, Benjamin Dep. at 95-96; Albaugh Decl. Ex. 6.

Because these facts are undisputed, Defendants argue that "PBGC has failed to establish that Renco would not have lost controlled group status if the instruments were labeled 'warrants.'"[28] Defendants are wrong. As noted in PBGC's summary judgment brief, controlled-group membership is determined using tests contained in Treasury Department regulations.[29] Importantly, a controlled group includes:

> [O]ne or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization if –
>     . . .
> (ii) The common parent organization owns (**directly and with the application of § 1.414(c)-4(b)(1), relating to options**) a controlling interest in at least one of the other organizations . . . .[30]

---

[27] *See Santa Fe*, 22 F.3d at 729. Apparently, it was unnecessary to "re-label" the other warrants, which had the same terms, because they might have expired sooner. Defs. Opp'n Brief at 12.

[28] Defs. Opp'n Brief at 23.

[29] *See e.g.*, 29 U.S.C. § 1301(a)(14)(A), (B); 29 C.F.R. § 4001.3; 26 C.F.R. §§ 1.414(c)-1, 1.414(c)-2. *See generally* PBGC SJ Brief at 23.

[30] 26 C.F.R. § 1.414(c)-2(b) (emphasis added); *see also* 26 C.F.R. § 1.414(c)-4(b)(1) (the holder of an option to acquire an outstanding interest is constructively treated as owning such interest).

A "controlling interest" is (1) 80% or more of the voting stock or total stock value for a corporation, and (2) 80% or greater profits or capital interest for a partnership.[31] If Cerberus had received two tranches of warrants, each exercisable for 24.5% of RG Steel's membership units, Renco would have continued to "directly" own all of RG Steel's membership units for controlled-group purposes. Cerberus would "constructively" own 49% of those same membership units, but that constructive ownership would not affect Renco's direct ownership.[32] The warrants give Cerberus the right (but not an obligation) to purchase the RG Steel membership units. Renco's ownership would not be reduced until the warrants were actually exercised, and the membership units were transferred to Cerberus.[33] Accordingly, Cerberus's receipt of warrants would not have decreased Renco's controlling interest in RG Steel, leaving Defendants responsible for the Pension Plans.[34]

Finally, Defendants' statements about the purported "immense value" of the RG Steel equity must be viewed in context.[35] RG Steel was preparing for bankruptcy. PBGC SOF ¶ 22;

---

[31] *See* 26 C.F.R. § 1.414(c)-2(b)(2)(i)(A), (C); *see also* Menke Decl. Ex. 41 (noting that it was important to show that Renco had less than 80% of RG Steel's capital).

[32] *See Bd. of Trs. of Trucking Emps. of N.J. Welfare Fund v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992) (describing the controlled-group rules and observing that "more than one company simultaneously may actually or constructively control a given business"); Menke Decl. Ex. 44 at RENGRP0023477-78 (upon surrender, Cerberus may purchase 24.5% of the membership units).

[33] *See* Menke Decl. Ex. 44 at RENGRP0023481 (stating that "nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities").

[34] Defendants further mischaracterize PBGC's view of warrants. Defs. Opp'n Brief at 14. Consistent with PBGC's position in this litigation, Mr. Cann testified that PBGC would have been very concerned about Renco's issuance of warrants to Elliott because "those warrants [would] be pretty easy to break the controlled group with" through actual exercise. Menke Decl. Ex. 11, Cann Dep. at 205; *see id.* at 154-55.

[35] Defs. Opp'n Brief at 7-8, 30. The relevancy of this argument is debatable, given Renco's expressed intent to unload 24.5% of the RG Steel equity to ensure a controlled-group break.

9

Defs. SOF ¶ 22. Cerberus valued RG Steel's total equity at $200,000, making its own portion worth less than $100,000. *See* Menke Decl. Ex. 41. And Cerberus had already rejected the idea of lending to RG Steel based solely upon receiving RG Steel equity as compensation. Menke Decl. Ex. 5.

Moreover, as Defendants note, "[t]he value the parties attributed to ownership in [RG Steel] is proven by the sums they placed at risk to obtain these ownership interests."[36] Cerberus obtained its equity with little or no risk. Cerberus committed to make a Term Loan A of $62.5 million, a Term Loan B of $62.5 million, and a Term Loan C of up to $100 million. Menke Decl. Ex. 2 ¶ 90. Renco gave Cerberus credit protection for **all** three loans. The Term Loan A was backed by a limited guaranty from Renco, secured by Renco's interest in Defendant US Magnesium LLC, and a limited guaranty from Defendant Ilshar Capital LLC,[37] secured by Ilshar Capital's interest in Millennium USA, L.P. *Id.* ¶¶ 92-93; Menke Decl. Ex. 20. The Term Loan B (and other loans) were secured by a second-position lien on RG Steel's assets, a position available only because Renco subordinated its own secured debt. *See* Menke Decl. Ex. 2 ¶ 91. Finally, the Term Loan C was backed by a capital call agreement, obligating Renco to participate in the loan under certain circumstances. Renco backed its obligations with a limited guaranty, secured by its interest in Ableco, LLC. Menke Decl. Ex. 2 ¶¶ 94-95. Thus, Cerberus's loans to RG Steel relied upon Renco's creditworthiness, not on RG Steel's (nonexistent) creditworthiness or its largely worthless equity. Thus the primary, if not sole, reason for transferring direct equity to Cerberus was to break the controlled group.

---

[36] *Id.* at 30.

[37] Ilshar Capital provided its limited guaranty for up to $50 million. Menke Decl. Ex. 2 ¶ 93.

### 2. *Renco made misrepresentations to PBGC about the status of the Transaction.*

Renco's misrepresentations to PBGC on January 13, 2012, further confirm that Renco entered into the Transaction with a principal purpose of pension evasion. Throughout PBGC's review of potential RG Steel transactions, Renco repeatedly assured PBGC that no transaction was imminent. *See* PBGC SOF ¶¶ 38-40; Menke Decl. Ex. 14.[38] On the morning of January 13, Renco's message remained the same. After PBGC told Renco that it was moving to terminate the Pension Plans before any transaction closed, Renco responded that "no transaction was about to happen," that "equity was off the table" with respect to any transaction, and that Renco was amenable to entering a standstill agreement with PBGC. *See, e.g.,* PBGC SOF ¶¶ 60-62; Menke Decl. Ex. 9, A. Rennert Dep. at 185-88; Menke Decl. Ex. 11, Cann Dep. at 199-207.

As explained in PBGC's prior briefs, Renco's statements were false.[39] In fact, everything about the true status of the Transaction on January 13 demonstrated its imminence. Since January 9, Renco and Cerberus counsel had been working day and night to document the Transaction. PBGC SOF ¶ 41; Menke Decl. Ex. 16. Renco had requested immediate approval of the Transaction from RG Steel's bank group, and told the other potential investor to stop work. PBGC SOF ¶¶ 44-45, 68-69. At the very moment Renco told PBGC that no deal was imminent, Renco and Cerberus were working to close the Transaction on January 17. PBGC SOF ¶ 72; Menke Decl. Ex. 36 at RENGRP0020648. And the Transaction did close on January 17, the first business day after Renco informed PBGC that nothing was imminent.

Renco made false statements to PBGC for one reason – to stop PBGC from terminating the Pension Plans before the Transaction closed and RG Steel was removed from Renco's

---

[38] PBGC still took appropriate steps to seek a settlement and also be prepared to terminate the Pension Plans in the event that the status changed. *See* PBGC SOF ¶¶ 34-37, 50-52.

[39] *E.g.,* PBGC SJ Brief at 26-28.

controlled group. Ira Rennert, Renco's Chairman, followed-up on his son Ari's false statements on January 13 with a plea that PBGC should not move to terminate the Pension Plans. *See* PBGC SOF ¶ 61.

Based on Renco's actions in structuring the Transaction and its misrepresentations to PBGC, the record supports summary judgment under 29 U.S.C. § 1369.

## II. RENCO'S MISREPRESENTATIONS AND OMISSIONS CAUSED PBGC TO SUSPEND ITS TERMINATION OF THE PLANS, TO PBGC'S DETRIMENT.

The record further confirms that PBGC is entitled to summary judgment against Renco on its state-law claims for fraud, fraudulent concealment, and negligent misrepresentation. Defendants argue that PBGC asserts a "new theory," but PBGC has consistently alleged its claims based on Renco's deception "as to the status and progress of negotiations with Cerberus" and its "knowing[] and active[] conceal[ment] [of] vital and relevant information from PBGC regarding the progress and status of the Transaction."[40] Discovery has confirmed the truth of PBGC's allegations, by clear, convincing, and undisputed evidence.

Facing the breadth of evidence supporting PBGC's claims, Defendants argue that PBGC "led Renco to believe" that PBGC would terminate the Pension Plans absent an executed standstill agreement, and that PBGC "had no reasonable basis to rely on Renco's statements."[41] Neither argument provides a defense to PBGC's fraud claims, and both ignore the record.

---

[40] First Am. Compl. at 16, 18. Defendants fault PBGC for supporting its complaint allegations with facts established through discovery. Defs. Opp'n Brief at 4, 31. That is discovery's purpose; PBGC's state-law claims remain focused on Renco's misrepresentations and omissions about the status and contours of the Transaction. PBGC raises no new theory of liability, so *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010), is inapposite.

[41] Defendants also argue that (1) Renco provided PBGC with all information "remotely material to PBGC's evaluation," (2) PBGC suspended termination for "independent reasons," and (3) PBGC could not terminate before the Transaction closed. Defs. Opp'n Brief at 33. These arguments are controverted by the record. PBGC Opp'n Brief at 24-33.

First, with regard to the standstill agreement, PBGC told Renco during the January 13 call that PBGC would terminate the Pension Plans absent a guarantee or standstill agreement. It is undisputed that Ira Rennert responded that plan termination would be terrible and asked Mr. Cann to instead send a draft standstill agreement for Renco's review. Menke Decl. Ex. 32, I. Rennert Dep. at 104-08. PBGC relied on these statements by sending the standstill agreement to Renco. Menke Decl. Ex. 11, Cann Dep. at 218-25; Menke Decl. Ex. 2 ¶¶ 77-78. Ari Rennert acknowledged receipt, and informed PBGC that he would seek review by Renco's attorneys and revert back. Menke Decl. Ex. 9, A. Rennert Dep. at 196-97. After the call and email exchange, Renco cannot have "reasonably believe[d] that PBGC was terminating the Plans,"[42] when Renco's statements were intended to (and did) achieve the opposite result.

Second, Defendants' assertion that PBGC had "no basis to rely on Renco's statements" defies reason. PBGC is a regulator with enforcement authority, and Renco is a regulated entity.[43] Renco must be truthful in its dealings with PBGC, a federal agency.[44] Defendants' effort to re-cast these discussions as an arms-length negotiation between two private companies is wrong.[45]

---

[42] Defs. Opp'n Brief at 33.

[43] PBGC issued a subpoena to Renco to obtain information about any transactions. Menke Decl. Ex. 12 at PBGC000037309-15. Defendants attempt to undercut PBGC's reliance by noting that PBGC approaches companies' statements about their financial condition with skepticism. *See* Decl. of Kevin Perra Ex. 4, Cann Dep. at 85-86; Decl. of Kevin Perra Ex. 5, Butler Dep. at 103-04. This has nothing to do with Renco's misrepresentations to PBGC on January 13 about the status of the Transaction or Renco's amenability to the standstill agreement.

[44] *See, e.g.*, *LaChance v. Erickson*, 522 U.S. 262, 265 (1998) ("Our legal system provides methods for challenging the Government's right to ask questions – lying is not one of them." (internal quotations and citations omitted)).

[45] Even if this case involved an "arms-length negotiation between private parties," PBGC rejects Renco's implication that it could lie with impunity. Such conduct is the essence of fraud.

13

Moreover, PBGC's reliance was entirely reasonable. Defendants challenge PBGC's reliance by noting that after PBGC received Ari Rennert's January 9, 2012 email, stating that "nothing was imminent" and that he would keep PBGC "apprised" of developments, PBGC continued to expedite the termination process. But in that same email, Ari Rennert stated that one investor needed two weeks of diligence and that "the status of [the other] transaction is unclear." Menke Decl. Ex. 14 at PBGC000038836. PBGC's termination process is just that – a *process*, which can take weeks. Based on Ari Rennert's statement that the timetable was "unclear," it was prudent for PBGC to expedite the process in case termination became necessary.[46] And PBGC was prepared to terminate the Pension Plans before the Transaction closed, as PBGC told Renco on January 13.[47] Ira Rennert responded by outlining the harm to RG Steel and concomitant loss of thousands of jobs, and by stating that Renco was amenable to entering a standstill agreement. Menke Decl. Ex. 32, I. Rennert Dep. at 104-08. Ari Rennert explained that no transaction was imminent. Menke Decl. Ex. 9, A. Rennert Dep. at 186. PBGC reasonably relied on these statements and suspended the termination process.[48]

Defendants conclude by claiming that PBGC assumed the risk of believing the Rennerts' misrepresentations. Defendants are wrong – PBGC never assumed the risk that the Rennerts were lying.[49] Defendants' reliance on *Century Pacific, Inc. v. Hilton Hotels Corp.* is misplaced. In *Century Pac*, the hotel-operator plaintiffs agreed to convert their hotels into Red Lion

---

[46] Menke Decl. Ex. 25 at PBGC-000055733 (requesting expedited procedures because "there was not time to process the case through the standard procedures"). As Defendants admit, PBGC could protect its interests by terminating the Pension Plans before any transaction, or by obtaining a guarantee (or entering a standstill to allow for negotiations). Defs. Opp'n Brief at 34.

[47] *See, e.g.*, PBGC Opp'n Brief at 32-33.

[48] *See id*. at 30-31; *see also* PBGC SJ Brief at 29-32.

[49] *See LaChance*, 522 U.S. at 265.

franchises.[50] One heavily negotiated provision of the contract allowed defendants to sell Red Lion. After defendants sold Red Lion, plaintiff filed suit and alleged, *inter alia*, that they were misled about the possibility of a sale. Relying on the parties' executed contract, which had been heavily negotiated, the court granted summary judgment for the defendants.[51]

*Century Pac* stands in stark contrast to this case.[52] The discussions between PBGC and Renco **were not** discussions between private parties. In any event, the *Century Pac* plaintiffs assumed the risk that defendants would exercise a contractual right that existed and was heavily negotiated. There was no such risk assumed by PBGC, and certainly no agreement outlining such risk. PBGC confronted the risk that Renco would close on the Transaction before PBGC could terminate, and did everything in its power to eliminate that risk. Indeed, PBGC thought the risk was eliminated when Ari Rennert assured PBGC that no transaction was about to occur, and Ira Rennert assured PBGC that Renco would take a good look at the standstill agreement. PBGC relied on those statements to its detriment.[53]

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of PBGC on all counts of the First Amended Complaint.

---

[50] 528 F. Supp. 2d 206, 210 (S.D.N.Y. 2007).

[51] *Id.* at 229-31.

[52] Defendants' reliance on *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531 (2d Cir. 1997), is similarly misplaced. It concerned a private transaction between a bank and an insurance company. *Id.* at 1534, 1545. Moreover, plaintiff alleged misrepresentations about facts contained in a report that was provided, but never read. *Id.* at 1535. Here, PBGC was provided with no materials outlining the actual timing and contours of the Transaction.

[53] Defendants also err by claiming that Mr. Cann told his superiors that the standstill agreement was in place. Defs. Opp'n Brief 5, 35. In fact, Mr. Cann told his superiors that Renco was amenable to a standstill and that no transaction was imminent. Albaugh Decl. Ex. 3, Messina Dep. at 200-02; Menke Decl. Ex. 24, Rae Dep. at 110; Bobroff Decl. Ex. 9, Rae Dep. at 121.

| | |
|---|---|
| Dated: August 15, 2014<br>New York, NY | By: *[signature: Sarah L. Reid]*<br>SARAH L. REID<br>JOSEPH BOYLE<br>MERRILL STONE<br>KELLEY DRYE & WARREN LLP<br>101 Park Avenue<br>New York, NY  10178<br>Phone: (212) 808-7800<br><br>-and-<br><br>ISRAEL GOLDOWITZ<br>Chief Counsel<br>KAREN L. MORRIS (*pro hac vice*)<br>Deputy Chief Counsel<br>JOHN A. MENKE (*pro hac vice*)<br>Assistant Chief Counsel<br>COLIN B. ALBAUGH (*pro hac vice*)<br>LOUISA A. FENNELL<br>Attorneys<br>Office of the Chief Counsel<br>1200 K Street, N.W.<br>Washington, DC 20005-4026<br>Phone: (202) 326-4020<br><br>*Attorneys for Plaintiff*<br>*PENSION BENEFIT GUARANTY*<br>*CORPORATION* |