UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-6-15
```

PENSION BENEFIT GUARANTY CORP.,

     Plaintiff,

 -v-

THE RENCO GROUP, INC., *et al.*,

     Defendants.

No. 13-cv-621 (RJS)
OPINION AND ORDER

<u>RICHARD J. SULLIVAN</u>, District Judge:

  Plaintiff Pension Benefit Guaranty Corp. ("PBGC") brings this action against the Renco

Group, Inc. ("Renco") and other related entities (collectively, "Defendants"), alleging liability

under the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829

("ERISA"), and New York common law. (Doc. No. 22 ("First Amended Complaint" or "FAC").)

Now before the Court are the parties' cross-motions for summary judgment as to all claims. For

the reasons set forth below, the Court denies the motions.

## I. BACKGROUND

### A. Statutory Background

  At issue in this case are provisions of Title IV of ERISA, which established a pension

insurance program and created the PBGC, a federally owned corporation, to administer and

enforce the program. 29 U.S.C. §§ 1301–1461.[1] The PBGC collects premiums from pension plan

administrators and, subject to statutory exceptions not at issue here, guarantees payment of

---

[1] Provisions of ERISA are often referred to interchangeably by their ERISA subdivision and by the United States Code subdivision under which they were codified. For ease of reference, Title IV of ERISA is equivalent to 29 U.S.C. §§ 1301–1461. Further, section numbers of ERISA beginning with 40 are equivalent to section numbers of Title 29 of the United States Code beginning with 13. Thus, for instance, Section 4043 of ERISA is codified at 29 U.C.C. § 1343. In this Opinion, the Court will refer to United States Code subdivisions in citations.

promised benefits.  *See* 29 U.S.C. §§ 1307, 1322.  In order to protect the solvency of the insurance

program, ERISA provides PBGC with several tools relevant to this case.  First, if a plan terminates

without sufficient assets to meet its obligations – and PBGC is thus required to pay the plan's

shortfall – ERISA imposes joint and several liability for the plan's shortfall, plus interest, on any

entity that sponsored the plan and, importantly here, any member of the sponsoring entity's

"controlled group."[2]  *See* 29 U.S.C. § 1362.  Second, ERISA and Treasury Regulations require

certain plan sponsors to notify PBGC no later than 30 days prior to any event that would result in

an entity ceasing to be part of the plan sponsor's controlled group.  *See* 29 U.S.C. § 1343(b)(3),

(c)(9); 29 C.F.R. §§ 4043.29, 4043.61(b).  This notification allows PBGC to investigate and take

action if the entity's absence from the controlled group might leave insufficient assets to cover any

plan shortfall.  Third, ERISA allows PBGC to terminate a plan if "the possible long-run loss [to

PBGC] with respect to the plan may reasonably be expected to increase unreasonably if the plan

is not terminated." 29 U.S.C. § 1342(a)(4).  As a result, upon receiving notice that a deep-pocketed

entity may be leaving a controlled group, PBGC can immediately terminate the plan and ensure

that the deep-pocketed entity remains liable for any plan shortfall.  Fourth, ERISA allows PBGC

to hold even a *former* member of a controlled group liable for a plan's shortfall if "a principal

purpose" of the transaction that resulted in that entity leaving the controlled group was "to evade

liability" under ERISA.  *See* 29 U.S.C. § 1369(a).

---

[2] A controlled group exists when one or more chains of corporations are connected through stock ownership to a common parent corporation and 80% of the stock of each corporation (except the common parent) is owned by one or more corporations in this group.  *See* 29 U.S.C. § 1301(14); 26 C.F.R. § 1.414(c)-2.  Thus, an entity is a member of a given controlled group if it either owns 80% or more of an entity in the controlled group or is 80% or more owned by entities in the controlled group.

B.  Factual Background[3]

1.  The Pension Plans

Renco is a private holding company, led by Chairman Ira Rennert and President Ari Rennert (collectively, the "Rennerts"), that makes long-term investments in businesses.  (PBGC 56.1 Stmt. ¶ 2; Renco 56.1 Stmt. ¶ 1.)  In February 2011, Renco formed a subsidiary, RG Steel LLC ("RG Steel"), to acquire the steel mill company Severstel Sparrows Point LLC ("Sparrows"), which in turn owned the steel mill companies Severstal Warren LLC and Severstal Wheeling LLC. (PBGC 56.1 Stmt. ¶ 9; Renco 56.1 Stmt. ¶ 4.)  On or around March 1, 2011, RG Steel entered into an agreement to purchase Sparrows.  (PBGC 56.1 Stmt. ¶ 9; Renco 56.1 Stmt. ¶ 5.)  Following this transaction, Renco directly or indirectly held complete ownership of RG Steel and its subsidiaries, including Sparrows and the two steel mill companies.  (PBGC 56.1 Stmt. ¶ 5; Renco 56.1 Stmt. ¶¶ 4–5.)  RG Steel also assumed responsibility for two pension plans covered by Title IV of ERISA:  the RG Steel Warren, LLC Hourly Employees Pension Plan (the "Warren Pension Plan") and the RG Steel Wheeling, LLC Pension Plan (the "Wheeling Pension Plan," and, together with the Warren Pension Plan, the "Pension Plans").  (PBGC 56.1 Stmt. ¶¶ 6–8; Renco 56.1 Stmt. ¶ 7.)

2.  Soliciting Outside Financing

RG Steel soon faced financial difficulties caused, at least in part, by poor conditions in the steel market.  (PBGC 56.1 Stmt. ¶ 14; Renco 56.1 Stmt. ¶ 8.)  To help deal with these difficulties, between July 5, 2011, and December 15, 2011, Renco loaned RG Steel over $109.8 million.

---

[3] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements. (Doc. No. 62 ("PBGC 56.1 Stmt."); Doc. No. 66 ("Renco 56.1 Stmt.").)  Unless otherwise noted, where only one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.  In deciding these cross-motions, the Court also considered the PBGC's memorandum of law in support of its motion for summary judgment (Doc. No. 60 ("PBGC Br.")), Renco's memorandum of law in support of its motion for summary judgment (Doc. No. 65 ("Renco Br.")), the PBGC's memorandum of law in opposition to Renco's motion (Doc. No. 71), Renco's memorandum of law in opposition to the PBGC's motion (Doc. No. 75), the PBGC's reply (Doc. No. 77), and Renco's reply (Doc. No. 78), along with the affidavits and exhibits attached thereto.

(PBGC 56.1 Stmt. ¶ 15; Renco 56.1 Stmt. ¶ 11.)  Additionally, between July and October 2011, Renco posted $50 million in cash collateral with a group of lending institutions including GE Capital Markets, Inc. and Wells Fargo Capital Finance (the "Bank Group") to secure additional financing.  (PBGC 56.1 Stmt. ¶ 9; Renco 56.1 Stmt. ¶ 12.)  However, this infusion of capital proved insufficient and RG Steel found itself needing more.  Accordingly, beginning in early November 2011, Renco and RG Steel contacted at least 20 outside sources of financing in an effort to secure a term loan of up to $200 million for RG Steel, originally soliciting a loan that did not include the transfer of any RG Steel equity.  (PBGC 56.1 Stmt. ¶ 16; Renco 56.1 Stmt. ¶¶ 15–16.)  Among the potential financing sources Renco contacted was Cerberus Capital Partners, L.P. ("Cerberus"), but Cerberus ultimately declined to pursue the deal Renco offered at that time.  (PBGC 56.1 Stmt. ¶¶ 17–18, 21; Renco 56.1 Stmt. ¶ 25.)

At some point, Renco began pursuing a financing arrangement that would require it to transfer some RG Steel equity.  (PBGC 56.1 Stmt. ¶ 18; Renco 56.1 Stmt. ¶ 21.)  On or around December 16, 2011, consistent with Renco's obligation under ERISA to give notice to the PBGC no later than 30 days prior to any event that would result in it ceasing to be part of the plan sponsor's controlled group – such as a sale of 20% or more of RG Steel's equity – Renco filed an Advance Notice of Reportable Events with the PBGC (the "Notice").  (PBGC 56.1 Stmt. ¶ 19; Renco 56.1 Stmt. ¶ 65.)  The Notice informed the PBGC that RG Steel was "in the market to raise capital" and that it was seeking capital in a transaction that would "likely result in RG Steel's ultimate parent, The Renco Group, Inc., owning less than 80% of the fully diluted shares of RG Steel."  (Renco 56.1 Stmt. ¶ 66.)  The Notice thus set the stage for Renco to close a transaction transferring 20% or more of RG Steel equity in mid-January or later.

Between late December 2011 and early January 2012, Ira Rennert contacted Cerberus to renew discussions regarding a possible financing transaction.  (PBGC 56.1 Stmt. ¶ 23; Renco 56.1 Stmt. ¶ 28.)   Renco proposed a transaction that would involve Cerberus providing $125 million in secured financing to RG Steel in return for, *inter alia*, a 49% ownership interest in RG Steel.  (PBGC 56.1 Stmt. ¶ 23; Renco 56.1 Stmt. ¶ 28.)  In early January 2012, Cerberus expressed interest in the possible transaction, and thereafter Cerberus resumed, on an expedited basis, the diligence it had begun on RG Steel in November 2011.  (PBGC 56.1 Stmt. ¶ 24; Renco 56.1 Stmt. ¶ 29.)

On January 10, 2012, Renco and Cerberus verbally reached what appeared to be an agreement on the principal terms of a financing transaction.  (PBGC 56.1 Stmt. ¶ 24; Renco 56.1 Stmt. ¶ 34.)  Significant to the instant action, when Renco and Cerberus first began exchanging drafts of the transaction documents, the first draft proposed by Cerberus's outside counsel provided that Cerberus would receive two tranches of warrants to purchase equity, each for 24.5% of RG Steel's stock, rather than direct equity in RG Steel.  (PBGC 56.1 Stmt. ¶ 46; Renco 56.1 Stmt. ¶ 47.)  One of the two tranches was made up of standard warrants, while the other contained warrants with rights largely consistent with equity, such as the right to participate in distributions, even on unexercised warrants.  (PBGC 56.1 Stmt. ¶ 46; Renco 56.1 Stmt. ¶¶ 48–49.)  Renco's outside counsel, Michael Ryan, requested that this latter tranche be structured as direct equity in the transaction, rather than warrants, purportedly because he viewed the tranche as actually containing direct equity and *not* warrants – that is, he believed the "warrant" label was a misnomer – and "wanted to avoid any crazy argument" that Renco would remain in RG Steel's controlled group.  (PBGC 56.1 Stmt. ¶ 46; Renco 56.1 Stmt. ¶¶ 47–49.)

By January 12, 2012, it became clear that Renco and Cerberus had different ideas about how to proceed.  (PBGC 56.1 Stmt. ¶ 24; Renco 56.1 Stmt. ¶ 36.)  On that date, Cerberus responded

critically to Renco's proposed edits to draft transaction documents, taking the position that one of

the terms proposed by Renco was a "show stopper" and that the "document [Renco] provided

[was] not even in the realm of anything [Cerberus could] work with for many reasons."  (Renco

56.1 Stmt. ¶¶ 36–38.)  On Friday, January 13, 2012 – immediately preceding the three-day Martin

Luther King, Jr. Day weekend – Renco and Cerberus remained in disagreement as to certain terms,

and Cerberus directed its lawyers to stop working on the transaction.  (Renco 56.1 Stmt. ¶ 39.)

Renco asserts that at this point, Cerberus had walked away from the deal.  (*Id.*)

### 3.  The PBGC's Involvement

Meanwhile, throughout early January 2012, the PBGC and Renco were in contact

regarding the status of Renco's financing efforts.  For example, on January 4, 2012, representatives

of the PBGC and Renco had a conference call during which Renco informed the PBGC that it was

working to obtain financing quickly, and that Renco was negotiating with two potential (then-

unnamed) investors.  (PBGC 56.1 Stmt. ¶ 27; Renco 56.1 Stmt. ¶¶ 6768, 73.)  The PBGC asserts

that on this conference call someone from Renco informed the PBGC that a financing agreement

could be struck during the week ending Friday, January 13, 2012 and close within the following

week or two; Renco asserts that on the call it informed the PBGC that it was working to *close* a

transaction as soon as January 13, 2012.  (PBGC 56.1 Stmt. ¶ 27; Renco 56.1 Stmt. ¶ 68.)  On

January 5, 2012, Dana Cann, the PBGC's point person for the issues relevant to this action, emailed

a Renco employee to reiterate the PBGC's concerns that a transaction resulting in Renco leaving

the RG Steel controlled group could result in the PBGC facing significant losses as a guarantor of

the underfunded Pension Plans.  (PBGC 56.1 Stmt. ¶ 29.)  As a result, Cann requested that Renco

guarantee the Pension Plans' liabilities to mitigate PBGC's concerns.  (*Id.*)  Cann emailed Renco

again on January 6, 2012, requesting an update on the status of any potential transaction, to which

a Renco employee responded that there was nothing new to report and that negotiations were

ongoing.  (PBGC 56.1 Stmt. ¶ 30; Renco 56.1 Stmt. ¶ 30.)  Cann also sent a letter to Renco on January 6, 2012, again outlining PBGC's concerns and requesting a guarantee.  (PBGC 56.1 Stmt. ¶ 31.)  On January 9, 2012, Ari Rennert responded to an email from Cann, writing, *inter alia*, that "nothing is imminent" and that "the status of the transaction is unclear.  Rest assured we will work with you and keep you apprised as soon as we learn anything."  (PBGC 56.1 Stmt. ¶ 39.)

At some point, the PBGC case team working on the Renco transaction also began preparing for a scenario whereby the PBGC would terminate the Pension Plans in order to mitigate the PBGC's potential exposure to underfunding in the Pension Plans and lock in Renco's liability. (PBGC 56.1 Stmt. ¶¶ 34–36; Renco 56.1 Stmt. ¶ 77.)  On or around January 6, 2012, the PBGC case team drafted the Trusteeship Working Group Memorandum (the "TWG Memo"), concerning the steps necessary to terminate the Pension Plans.  (Renco 56.1 Stmt. ¶ 77.)  Because one of the requirements of plan termination under ERISA is the provision of notice to participants, the TWG Memo delineated that the "PBGC will provide notice to participants advising them of the Plans' termination by newspaper publication."  (*Id*.)  To this end, also on January 6, 2012, the PBGC case team notified the PBGC's public affairs department, which handles newspaper publication, of the fact that the PBGC might soon thereafter need to issue notice.  (PBGC 56.1 Stmt. ¶ 35.)  Although the parties agree that the PBGC's public affairs department needed to make reservations for newspaper space at least three days in advance of publication, they dispute whether it required three business days or three calendar days.  (Renco 56.1 Stmt. ¶ 79.)

On the weekend of January 7–8, 2012, the PBGC case team drafted a memorandum recommending that PBGC terminate the plans, which was reviewed by the PBGC's director on January 9–10, 2012, skipping intermediate review to expedite the process.  (PBGC 56.1 Stmt. ¶¶ 36–37; Renco 56.1 Stmt. ¶ 77.)  On Friday, January 13, 2012, the PBGC's director signed a

document approving the termination of the Pension Plans.  (PBGC 56.1 Stmt. ¶ 52.)  At that point, the two primary steps that remained before the PBGC could terminate the Plans were (a) the director signing the Notices of Determination ("NODs"), and (b) the PBGC issuing the NODs and giving notice of the termination to plan participants and beneficiaries.  (PBGC 56.1 Stmt. ¶ 53.)

### 4.  January 13, 2012 Communications

On Friday, January 13, 2012, around 10:00 a.m., Dana Cann of the PBGC spoke with the Rennerts by telephone.  (PBGC 56.1 Stmt. ¶ 58; Renco 56.1 Stmt. ¶ 85.)  On the call, Cann informed the Rennerts that the PBGC would terminate the Pension Plans unless Renco agreed to guarantee its liability or enter into a "standstill" agreement to maintain the status quo pending the negotiation of a resolution.  (PBGC 56.1 Stmt. ¶ 59; Renco 56.1 Stmt. ¶ 86.)  The Rennerts did not agree to sign a standstill agreement or guarantee during the call, but expressed a willingness to review a standstill agreement if the PBGC sent one.  (PBGC 56.1 Stmt. ¶ 61; Renco 56.1 Stmt. ¶ 87.)  During the call, Ari Rennert told Cann that no transaction was imminent and that "a" transaction was "dead."  (PBGC 56.1 Stmt. ¶ 60; Renco 56.1 Stmt. ¶ 86.)  Additionally, the PBGC asserts that one of the Rennerts said on the call that equity was "off the table," meaning that Renco was no longer considering a transaction that would result in it transferring equity; Renco disputes this assertion.  (PBGC 56.1 Stmt. ¶ 52.)  Immediately after the call, Cann emailed the PBGC group working on termination, stating:  "As an update – Renco is amenable to entering into a standstill agreement with us.  OCC [PBGC's Office of the Chief Counsel] is drafting, and we can expect to send it to Renco soon.  If we get an acceptable standstill in place, we can wait on the notice."  (Renco 56.1 Stmt. ¶ 89 (emphasis in original).)  The PBGC continued taking steps toward termination of the Pension Plans immediately following this call and email.  (Renco 56.1 Stmt. ¶ 90.)  Later, at 3:41 p.m. on January 13, Cann emailed a draft standstill agreement to Ari Rennert, who responded that he would forward the draft to Renco's counsel and "revert back" to Cann.

(PBGC 56.1 Stmt. ¶¶ 63–64.)  A few minutes later, Cann emailed his superiors and the PBGC case team, stating:  "By way of update, we have sent a draft standstill agreement to Renco.  While we now have a fully approved termination package, *we're holding the notices for now*."  (PBGC 56.1 Stmt. ¶ 65 (emphasis added); Renco 56.1 Stmt. ¶ 93.)  Thus, on the afternoon of Friday, January 13, 2012, the PBGC suspended the process of terminating the Pension Plans.  (*Id.*)

### 5.  The Financing Transaction

As noted above, also on January 13, 2012, the oral agreement in principle between Cerberus and Renco purportedly fell apart.  (PBGC 56.1 Stmt. ¶ 73; Renco 56.1 Stmt. ¶ 40.)  However, later that day – sometime between Cann's phone call with the Rennerts and Ari Rennert's email to Cann noting that he would "revert back" after forwarding the draft standstill to Renco's counsel – a representative of Cerberus contacted Ari Rennert in an attempt to revive discussions between the two parties.  (PBGC 56.1 Stmt. ¶¶ 75–76; Renco 56.1 Stmt. ¶¶ 41–43.)  The two sides agreed to schedule a meeting for the next day between the principals of Renco and Cerberus to try to negotiate a deal.  (PBGC 56.1 Stmt. ¶ 76; Renco 56.1 Stmt. ¶ 43.)  At this Saturday, January 14 meeting, Cerberus and Renco reached an understanding as to the key remaining disputed terms, and instructed their counsel to begin drafting transaction documents to reflect their understanding.  (PBGC 56.1 Stmt. ¶ 77; Renco 56.1 Stmt. ¶ 44.)  Additionally, after a phone call between counsel for Renco and counsel for Cerberus on January 15, the two parties agreed to structure the transaction in such a way that Cerberus would receive some RG Steel equity directly along with warrants, which could expire in certain circumstances, to purchase an additional tranche of equity.  (PBGC 56.1 Stmt. ¶ 80; Renco 56.1 Stmt. ¶ 51.)  The transaction closed on Tuesday, January 17, 2012, the day after the Martin Luther King, Jr. Day holiday and four days after the last time anyone from Renco communicated with the PBGC.  (PBGC 56.1 Stmt. ¶ 81; Renco 56.1 Stmt. ¶ 52.)

9

Under the terms of the finalized deal, Cerberus provided two term loans to RG Steel totaling $125 million, and received, *inter alia*, 24.5% of RG Steel's direct equity and warrants to purchase another 24.5%.  (Renco 56.1 Stmt. ¶ 53.)  Accordingly, following the transaction, Renco was no longer the beneficial owner of 80% or more of RG Steel, and was thus no longer in RG Steel's controlled group.  As part of the deal, Renco also agreed to subordinate its rights to recover $127 million of its prior loans to RG Steel and $50 million in cash collateral posted with the Bank Group.  (Renco 56.1 Stmt. ¶ 54.)  Additionally, pursuant to the capital call agreement between the parties, Renco later provided an additional $60 million in cash collateral to Cerberus so Cerberus would loan additional funds to RG Steel.  (Renco 56.1 Stmt. ¶ 58.)  Renco asserts that, all told, it put at least $185 million of its own funds at risk in connection with the Cerberus transaction. (Renco 56.1 Stmt. ¶ 62.)

As it turned out, the influx of capital did not stave off RG Steel's failure for long.  RG Steel declared bankruptcy on May 31, 2012, just over four months after the Cerberus transaction closed. (PBGC 56.1 Stmt. ¶ 90; Renco 56.1 Stmt. ¶ 61.)   In November 2012, the PBGC entered into agreements with the plan administrator for each of the Pension Plans (1) terminating each of the Pension Plans, and (2) establishing August 31, 2012 as the termination date for each Plan.  (PBGC 56.1 Stmt. ¶ 92.)  The termination left the PBGC on the hook for the $70 million shortfall in the funding of the Pension Plans, and this lawsuit followed.  (Doc. No. 1.)

## C.  Procedural History

The PBGC commenced this action on January 28, 2013, asserting a claim for ERISA reachback liability under 29 U.S.C. § 1369(a), along with New York State law claims for fraud, fraudulent concealment, and negligent misrepresentation.  (Doc. No. 1.)  The PBGC subsequently filed an amended complaint, which alleged the same causes of action.  (FAC.)  On March 13, 2014, the Court denied Renco's motion to dismiss the First Amended Complaint for failure to state a

claim.  (Doc. No. 44.)  At the conclusion of discovery, both parties sought, and the Court granted, leave to file the instant cross-motions for summary judgment.  Thereafter, the parties filed the instant cross motions on June 20, 2014.  (Doc. Nos. 59–70.)  The motions were fully submitted on August 15, 2014.  (Doc. Nos. 77–79.)

## II.  Legal Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996).  Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted).  "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the

[nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact.  A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]," *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "On cross-motions for summary judgment, each moving party 'has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor.'" *McDonnell v. First Unum Life Ins. Co.*, No. 10-cv-8140 (RPP), 2013 WL 3975941, at *13 (S.D.N.Y. Aug. 5, 2013) (quoting *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988)).

III.  DISCUSSION

A.  ERISA Claim

As noted above, Section 1369(a) assigns reachback liability to companies or persons who evade pension obligations by, *inter alia*, selling ownership interests in subsidiaries in order to reduce their ownership below 80%.  It provides:

> If *a principal purpose of any person in entering into any transaction is to evade liability* to which such person would be subject under this subtitle and the transaction becomes effective within five years before the termination date of the termination on which such liability would be based, then such person and the members of such person's controlled group (determined as of the termination date) shall be subject to liability under this subtitle in connection with such termination as if such person were a contributing sponsor of the terminated plan as of the termination date.

29 U.S.C. § 1369 (emphasis added).  There is no dispute here that the Pension Plans were terminated less than five years after the effective date of the Renco-Cerberus transaction, as the transaction closed on January 17, 2012 and the Pension Plans were terminated in November 2012 with an effective date of August 31, 2012.  Accordingly, the inquiry relevant to determining

whether Renco must face reachback liability here is whether *a principal purpose* of entering the Cerberus transaction was to evade liability by removing itself from RG Steel's controlled group, through a reduction of its ownership of RG Steel below 80%.  Although there is very little case law interpreting § 1369(a) specifically, the Court here will also consider as persuasive the case law interpreting another ERISA provision, § 1392(c), which provides in the multiemployer pension plan context that if "a principal purpose of any transaction is to evade or avoid liability under this part[, which imposes upon a withdrawing employer liability for its share of unfunded vested benefits], this part shall be applied (and liability shall be determined and collected) without regard to such transaction."  29 U.S.C. § 1392(c).

By its plain language – imposing liability if evasion was *a* principal purpose of the transaction – § 1369(a) allows for the fact that a transaction may have more than one principal purpose, such that reachback liability applies if *any* of the principal purposes of a party entering a transaction is to evade its pension obligations.  In interpreting § 1392(c), another court in this District has noted that "one [principal] purpose may motivate an employer's decision to conduct a transaction, while another [principal] purpose may motivate the decision about how to structure this transaction," and if either purpose is to avoid or evade liability, the employer will be liable. *Lopresti v. Pace Press, Inc.*, 868 F. Supp. 2d 188, 201 (S.D.N.Y. 2012).  At the same time, however, the "clear import of 'a principal' is to let the employer off the hook even if *one of* his purposes was to beat withdrawal liability, provided however that it was a minor, subordinate purpose, as distinct from a major purpose."  *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725 (7th Cir. 1994) (emphasis added) (interpreting § 1392(c)); *see also, e.g., id.* at 729 ("[A] purpose for the sale of stock is 'principal' if, were it absent, the sale would not have taken place."); *Teamsters Joint Council No. 83 of Va. Pension Fund v. Empire Beef Co.*,

No. 08-cv-340, 2011 WL 201492, at *3 (E.D.Va. Jan. 20, 2011) ("Section 1392(c) does not apply unless evading withdrawal liability was one of the factors that *weighed heavily* in the employer's thinking." (alteration and internal quotation marks omitted) (emphasis in original)).   Additionally, "there is a difference between knowing that the result of the transaction would be that withdrawal liability would not be paid and designing the transaction with a principal purpose of achieving this result." *Lopresti*, 868 F. Supp. 2d at 204.

Here, the Court concludes that disputed issues of material fact preclude summary judgment in favor of either the PBGC or Renco.   The parties do not dispute that RG Steel was in dire need of capital, and that at least one of the principal purposes of Renco in seeking financing for RG Steel was to improve its financial position.   (*See* PBGC Br. at 1.)   However, there are facts from which a reasonable factfinder could conclude that Renco structured the transaction specifically to reduce its ownership stake below 80% and to evade pension liability.   For example, Cerberus originally proposed that it would receive only warrants to purchase equity, rather than the direct equity it ultimately received, and when Renco countered by "tak[ing] the position that Cerberus should be receiving equity rather than warrants" (PBGC 56.1 Stmt. ¶ 70), Cerberus wrote back to Renco, saying, "We have always discussed warrants. We are a lender and should [not] be forced to hold direct equity" (*id*. ¶ 48).   Ultimately, however, Cerberus acquiesced.   The fact that Cerberus originally resisted direct equity but Renco pushed back enough to overcome Cerberus's resolve suggests that this issue may have been a deal-breaker for Renco, and that avoiding pension liability *may* have been a principal purpose of the particular transaction.   Additionally, while the parties dispute what was said during the January 13, 2012 phone call between the Rennerts and Dana Cann, under the PBGC's version of the call one of the Rennerts said that equity was "off the table" and that "no transaction was about to happen, that a transaction was dead."   (PBGC 56.1 Stmt.

14

¶ 60; Renco 56.1 Stmt. ¶ 86.)  Drawing all inferences in the PBGC's favor, a reasonable factfinder could (1) infer that the Rennerts consciously engaged in deceptive practices designed to evade liability for the Pension Plans, and (2) conclude that such evasion was a principal purpose of the transaction with Cerberus.  Moreover, Renco's radio silence in communicating with the PBGC just days after Ari Rennert told the PBGC that "[r]est assured we will work with you and keep you apprised as soon as we learn anything" could likewise support an inference that pension liability evasion was a principal purpose of Renco's transaction with Cerberus.

Nonetheless, in alternatively drawing all reasonable inferences in favor of Renco, the Court is also unable to conclude as a matter of law, at this stage, that evasion *was* a principal purpose of the deal.  As noted above, RG Steel was in serious need of financing, and there is evidence in the record to support the fact that Cerberus would not have provided financing without some form of equity involved.  (*See* Renco 56.1 Stmt. ¶ 30.)  When Cerberus ultimately accepted direct equity instead of warrants to purchase equity, the change did not materially alter Cerberus's rights or the attributes associated with the securities.  (*Id.* ¶ 51.)  Renco's outside counsel, Michael Ryan, never suggested that Renco would not have done the deal with Cerberus if Cerberus did not agree to accepting direct equity.  Additionally, drawing reasonable inferences in Renco's favor, a factfinder could conclude that the Rennerts were not evasive during the January 13, 2012 phone call, but honestly and accurately informed Dana Cann that their transaction with Cerberus had fallen apart in the preceding two days.  It is a reality of financing transactions that deals can fall apart and come back together in a very short period of time, and evidence in the record suggests that at least Cerberus viewed the deal as being dead at the time of the January 13 phone call.  Finally, while not dispositive in light of the significant pension liability Renco avoided in the deal with Cerberus, the fact that Renco itself put an additional $185 million on the line in connection with the

15

transaction supports the inference that pension liability evasion may not have been a principal purpose.  In sum, whether "a principal purpose" of Renco in entering the transaction with Cerberus was to evade liability depends on competing inferences, and the Court cannot decide this question of fact at this stage.  Summary judgment as to the PBGC's § 1369(a) claim, therefore, must be denied.

### B.  Common Law Claims

Counts 2 through 4 of the First Amended Complaint assert claims for fraudulent inducement, fraudulent concealment, and negligent misrepresentation.  To prevail on its fraudulent inducement claim, the PBGC must prove "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  *Allison v. Round Table Inv. Mgmt. Co., LP*, 447 F. App'x 274, 275 (2d Cir. 2012).  To prove fraudulent concealment, the PBGC must establish "a relationship between the contracting parties that creates a duty to disclose, knowledge of the material facts by the party bound to disclose, scienter, reliance, and damage."  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 582 (2d Cir. 2005).  Finally, to prevail on its claim for negligent misrepresentation, the PBGC must establish that Renco was "careless in imparting words upon which others were expected to rely and upon which they did or failed to act to their damage, and . . . ha[d] some relationship or duty to act with care vis-à-vis the party at whom the statement [was] directed."  *Id.* at 583 (alteration and internal quotation marks omitted).

Here, the Court finds that disputed issues of material fact preclude summary judgment in favor of either party on Plaintiff's common law claims.  Specifically, the parties' disputes make it impossible to decide at this stage whether Renco made a material misrepresentation with scienter,

whether the PBGC justifiably relied on the alleged misrepresentation, and whether the PBGC's reliance actually caused its injury.

As to misrepresentation, the parties dispute (1) whether the Rennerts' remarks that "no transaction was about to happen, that a transaction was dead," and that Renco would be willing to consider a standstill agreement, were misrepresentations, and (2) whether either of the Rennerts stated that equity was "off the table" during the January 13 phone call.  First, the Court cannot decide as a matter of law whether statements suggesting that its financing negotiations had fallen apart were misrepresentations, because the interpretation of such statements depends on a choice among competing inferences as to the statements' meaning and on disputed facts regarding the status of negotiations at the time of the January 13 phone call.  Second, whether one of the Rennerts told Cann that equity was "off the table" during the January 13 phone call is a disputed issue of fact as well.

Regarding reliance, the Court concludes that the facts of this case allow for competing inferences as to whether the PBGC relied on the representations of Renco in suspending the termination process for the Pension Plans.  The PBGC suspended the termination process just hours after the January 13 phone call during which the Rennerts allegedly misrepresented the status of negotiations and whether equity was "off the table," and in the face of Renco's averment that it would keep the PBGC "apprised" of any developments regarding its negotiations, the Court cannot conclude that the PBGC was not acting in reasonable reliance on statements of the Rennerts in suspending termination.  Nonetheless, the Court also cannot conclude as a matter of law that the PBGC actually relied on the allegedly misrepresentative statements of the Rennerts in the first place.  In the immediate aftermath of the January 13 phone call, Dana Cann emailed the PBGC group working on Renco's case, noting that Renco was "amenable to entering into a standstill

17

agreement" and that "*[i]f we get an acceptable standstill in place*, we can wait on the notice." (Renco 56.1 Stmt. ¶ 89 (underline in original, italics added).)  This email suggests that the PBGC's plan was to continue the termination process unless and until Renco *actually agreed* to enter into a standstill agreement.  However, immediately after Cann emailed the Rennerts a draft standstill agreement a few hours later – at almost 4:00 p.m. on Friday, January 13 – he emailed the PBGC team that, "[b]y way of update, we have sent a draft standstill agreement to Renco.  While we now have a fully approved termination package, we're holding the notices for now.  Thanks, all."  (*Id*. ¶ 93.)  One of Cann's supervisors, who was one of the people in charge of the ultimate decision whether or not to terminate the Pension Plans, testified that she held off on moving forward with termination because she believed, based on Cann's emails, that Renco had agreed in principal to a standstill agreement, even though it is undisputed that the Rennerts did not agree to sign the standstill agreement during the phone call with Cann.  (*See* Declaration of Colin B. Albaugh, dated July 18, 2014, Doc. No. 72, Ex. 3 ("Messina Dep."), at 200:7–205:5.)  If the PBGC's suspension of the termination process was not based on Renco's alleged misrepresentations, but was instead based on an intervening misunderstanding of the facts caused by one of its employees, it could not be said that the PBGC acted in reliance on Renco's representations.  Nonetheless, another one of Cann's superiors testified that the decision to suspend termination was based on the Rennerts' representations that no transaction was imminent, and so the Court finds that there are disputes of fact as to reliance, or the lack thereof.

Finally, causation is an element of each of the PBGC's common law claims, and the Court concludes that issues of fact preclude summary judgment based on this element as well.  The TWG Memo, which outlined the steps the PBGC planned to take in terminating the Pension Plans, indicated that the PBGC was planning on giving notice to plan participants by publication in local

newspapers.  However, as of 10:58 a.m. on Friday, January 13 – when, according to Cann's emails, the PBGC was still going forward with termination of the Pension Plans and would continue to do so barring a signed standstill agreement – the PBGC public affairs department stated that in light of the Martin Luther King, Jr. holiday on Monday, January 16, "the earliest publication date would be next Thursday," January 19, 2012.  (*See* Declaration of Bradley R. Bobroff, dated June 20, 2014, Doc. No. 69, Ex. 31.)  Thus, it does not appear that the PBGC would have been able to give notice by newspaper publication before the Renco-Cerberus transaction closed on January 17, 2012.  Given that the PBGC had only planned on giving notice in this manner, and had not planned an alternative, the Court has significant doubts as to the causal relationship between Renco's alleged misrepresentations and the PBGC's injury.  However, as PBGC employees also testified that they would have looked into other methods of notice but for the false assertions of the Rennerts, and would have considered giving notice by online publication, the Court cannot conclude as a matter of law that the PBGC would not have been able to terminate the Pension Plans in the absence of the Rennerts' allegedly false and misleading statements.

Accordingly, competing inferences and issues of fact preclude granting summary judgment in favor of either Renco or the PBGC on the PBGC's common law claims.

## IV.  CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT the parties' cross-motions for summary judgment are DENIED.  The Clerk of the Court is respectfully directed to terminate the motions pending at docket entries 57, 59, and 64.

IT IS FURTHER ORDERED THAT the parties shall commence trial on the morning of July 6, 2015.

IT IS FURTHER ORDERED THAT, by June 1, 2015, the parties shall submit a Joint Proposed Pretrial Order that includes, in separately numbered paragraphs, the information required by Federal Rule of Civil Procedure 26(a)(3) and the following:

i.      The full caption of the action;

ii.     The names, addresses (including firm names), and telephone and fax numbers of trial counsel;

iii.    A brief statement by Plaintiff as to the basis of subject-matter jurisdiction, and a brief statement by Defendants to the presence or absence of subject-matter jurisdiction.  Such statements shall include citations to all authority relied on and relevant facts as to citizenship and jurisdictional amount;

iv.     A brief summary by each party of the claims and defenses that the party has asserted which remain to be tried, without recital of evidentiary matters but including citations to all statutes relied on.  Such summaries shall identify all claims and defenses previously asserted which are not to be tried;

v.      A statement by each party as to the number of trial days needed;

vi.     A statement as to whether all parties have consented to trial of the case by a magistrate judge (without identifying which party or parties have or have not so consented).

vii.    Any stipulations of fact or law that have been agreed to by the parties;

viii.   A statement by each party as to the witnesses whose testimony is to be offered in its case in chief;

ix.     A designation by each party of deposition testimony to be offered in its case in chief, with any cross-designations and objections by any other party;

x.      A list by each party of exhibits to be offered in its case in chief, with an indication of whether any party objects to the exhibit and a *brief* statement of the nature of the objection (e.g., "relevance," "authenticity," "hearsay"); and

IT IS FURTHER ORDERED THAT the parties shall file the following with the Joint Proposed Pretrial Order:

i.      Proposed findings of fact and conclusions of law.  Proposed findings of fact should be detailed and a Word version should be submitted by e-mail.

    ii.        Motions addressing any evidentiary or other issues which should be resolved *in limine*; and

    iii.       In any case where a party believes it would be useful, a pretrial memorandum, not to exceed 10 pages.

IT IS FURTHER ORDERED THAT each party shall serve, but not file, the following at the time the Joint Proposed Pretrial Order is filed:

    i.        Affidavits constituting the direct testimony of each trial witness, except for testimony of an adverse party, a person whose attendance must be compelled by subpoena, or a person for whom a party has requested and the Court has agreed to hear direct testimony during the trial.  Three business days after submission of such affidavits, counsel for each party shall submit a list of all affiants whom he or she intends to cross-examine at the trial.  Only those witnesses who will be cross-examined need appear at trial.  The original affidavit shall be marked as an exhibit at trial;

    ii.        All deposition excerpts which will be offered as substantive evidence, as well as a one-page synopsis (with page references) of those excerpts for each deposition; and

    iii.       All documentary evidence.

IT IS FURTHER ORDERED THAT, within one week of the filing of the Joint Proposed Pretrial Order, any party may file the following documents:

    i.        Oppositions to any motions *in limine*; and

    ii.        Oppositions to any legal argument in a pretrial memorandum.

IT IS FURTHER ORDERED THAT the parties shall appear for a final pretrial conference on Wednesday, July 1, 2015, at 2:00 p.m.

SO ORDERED.

Dated:      March 5, 2015
           New York, New York

                                      RICHARD J. SULLIVAN
                                      UNITED STATES DISTRICT JUDGE